Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | Ian H. Levin |
|---|---|---|---|
| **CASE NUMBER** | 01 C 67 | **DATE** | 4/18/2002 |
| **CASE TITLE** | Choiceparts LLC vs. GM Corp | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing held.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order. Choiceparts motion for preliminary injunction [6-1] is denied.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 8 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | APR 19 2002 | | |
| | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | 4/18/2002 | 126 |
| | | | date mailed notice | |
| SM | courtroom deputy's initials | | SM | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN·DIVISION

| | |
|---|---|
| CHOICEPARTS, LLC, a Delaware<br>Limited Liability Company,<br><br>　　Plaintiff,<br><br>v.<br><br>GENERAL MOTORS CORPORATION, a<br>Delaware Corporation, DAIMLERCHRYSLER<br>CORPORATION, a Delaware Corporation, FORD<br>MOTOR COMPANY, a Delaware Corporation,<br>and OECONNECTION LLC, a Delaware Limited<br>Liability Company,<br><br>　　Defendants. | Case No. 01 C 0067<br><br>Magistrate Judge Ian H. Levin |

*DOCKETED*
*APR 1 9 2002*

## MEMORANDUM OPINION AND ORDER

Before the court is ChoiceParts' ("Plaintiff") Motion for a Preliminary Injunction. The subject motion concerns Plaintiff's assertion that Defendants General Motors Corporation ("GM"), DaimlerChrysler ("DCX"), Ford Motor Company ("Ford") and OEConnection, LLC ("OEC") willfully conspired to withhold automotive parts data Plaintiff needs to operate it's automotive parts locator business. Consequently, Plaintiff in this motion alleges that Defendants' refusal to provide parts data constitutes a conspiracy that unreasonably restrains trade in contravention of the antitrust laws.

I. *Background*

　A. *Original Equipment Manufacturers*

Defendants GM, DCX and Ford are Original Equipment Manufacturers ("OEM") who sell automobiles and original equipment ("OE") parts through their dealers. Defs.' Mem. at 2. Specifically, each OEM sells parts only through its authorized dealers, who then compete with each other and with "aftermarket" (non-OE, knock-off) and "salvage" (recycled) parts sellers. *Id.* Dealers, in turn, sell OE

parts to other dealers, collision shops, and retail customers. *Id.* Dealers buy parts from other dealers when, for example, a needed part is unavailable from an OEM. *Id.*

Dealers have many ways of locating automotive parts. Defs.' Mem. at 3. For instance, they can call other dealers or they can use electronic parts locator services; such as OneTouch, National Parts Locator ("NPL"), or Parts Voice. *Id.* Moreover, each OEM has developed data about each of its parts, including detailed pricing information and cross-references to substitutable parts (i.e., "supersession data") (collectively, "Parts Data"). Each Defendant OEM owns its own Parts Data and this data is considered to be highly proprietary. *Id.*

Almost all automobile dealers manage their parts businesses with software called "dealer management systems" ("DMSs"). Defs.' Mem. at 3. The two largest DMS providers are Reynolds & Reynolds ("Reynolds") and Automated Data Processing ("ADP"). *Id.* Each OEM licenses its Parts Data to DMS providers for use by its respective dealers. *Id.* Moreover, OneTouch, NPL, and PartsVoice receive Parts Data from each OEM.[1] *Id.* However, none of the OEMs license their Parts Data to these companies, or to any others that sell non-OE aftermarket parts. *Id.*

OEC is a joint venture which was formed by Defendants GM, Ford and DCX, and Bell & Howell in December, 2000. Pl.'s Mem. at 11. OEC was established for the purpose of operating a parts locator service using Defendants' Data Parts and selling OE parts only. *Id.* at 12.

B.    *ChoiceParts*

ChoiceParts was created as a joint venture in May, 2000 by three companies in the automotive software industry: ADP (over $6 billion in annual revenue), Reynolds ($1 billion in annual revenue) and CCC Information Services ("CCC") (over $200 million in annual revenue).[2] Pl.'s Mem. at 3.

---

[1]Other parts locators, however, operate without incorporating Parts Data (e.g., parts.com and Wrenchhead). Defs.' Mem. at 3.

[2]ADP and Reynolds are leading DMS providers, and CCC and ADP are leading "collision estimating systems" providers. Pl.'s Mem. at 3.

ChoiceParts was organized to "engage in the business of creating and operating an Internet and network-based marketplace for the purchase and distribution of OEM Parts, Non-OEM Parts and Salvaged Parts." ChoiceParts was based upon its founding companies' industry knowledge and expertise to create an end-to-end solution comprised of two components: (1) dealer-to-dealer software designed to enable dealers to locate parts from other dealers and consummate transactions electronically, and (2) dealer-to-collision shop software designed to allow dealers to accept orders electronically from collision shops, interface with the dealer-to-dealer locator software as necessary, and consummate sales transactions with collision shops electronically. *Id.*

Plaintiff initially developed an automotive parts locator designed to provide participating dealers with access to real-time inventory information from potential sellers. Pl.'s Mem. at 4. The software allows dealers to search not only for specific part numbers, but also (using "supersession" data) to locate parts that are interchangeable with the original part identified by the dealer. *Id.* Plaintiff plans to integrate its dealer-to-dealer software with DMS's enabling selling dealers to automatically generate invoices and adjust inventory information. *Id.*

In the latter part of 2000, Plaintiff conducted a "proof-of-concept" test pilot of the dealer-to-dealer software in Dayton, Ohio. Pl.'s Mem. at 4. As a result of the test pilot, Plaintiff initiated and signed contracts with over 250 dealers (including GM, Ford and DCX dealers). *Id.* In April, 2001, Plaintiff acquired rights to software used by collision shops. *Id.* Plaintiff has, subsequently, developed dealer-to-collision software allowing collision shops to order parts from dealers electronically rather than by manual ordering processes. *Id.*

II.     *Plaintiff's Motion for Entry of a Preliminary Injunction*

      A.     *Introduction*

In its opening memorandum, Plaintiff's threshold assertion is that it has satisfied the requirements for entry of a preliminary injunction. Pl.'s Mem. at 14.

A party seeking a preliminary injunction must establish: (1) some likelihood of succeeding on the merits; (2) that it has "no adequate remedy at law," and (3) that it will suffer "irreparable harm," if preliminary relief is denied. *Abbott Lab. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992) (*citing Lawson Prods., Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1433 (7th Cir. 1986); *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386-87)). If the moving party is unable to establish this threshold showing, the court's inquiry is over and the injunction will be denied. *Id.* If the moving party can satisfy this showing, the court must then consider the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied. *Id.* Lastly, the court must also consider the public interest, that is, the consequences to non-parties of granting or denying the injunction. *Id.*

B.    *Arguments*

(1) Plaintiff presents the following arguments in support of its assertion that it will succeed on the merits of its antitrust claim.

(a) Plaintiff first argues that Defendants' concerted refusal to provide it with Parts Data violates Section 1 of the Sherman Act. Pl.'s Mem. at 14. To prevail under Section 1, Plaintiff asserts that it must establish a "contract, combination, . . . or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1.

(i) Direct Evidence of Conspiracy

Plaintiff alleges that there is direct evidence of a conspiracy, in that, Defendants have unlawfully agreed not to provide Parts Data to Plaintiff. Pl.'s Mem. at 15. Plaintiff presents the following evidence in support of its conspiracy theory.

Plaintiff asserts that the conspiracy began in early 2000. Pl.'s Mem. at 8. For example, in GM's March 10, 2000, "Opportunities and Threats" presentation to its parts division management, Plaintiff was described as a potential threat to GM's revenue; thereby, jeopardizing the division's ability to meet commitments made to GM's Board of Directors. Knott Ex. 1; Mackie Dep. 89. Shortly thereafter, in early May 2000, GM, Ford and DCX representatives attended a private conference conducted by

4

Carlisle & Company ("Carlisle"), an industry consultant that had worked extensively with GM, DCX and other OEMs. *Id.* At the conference, Carlisle presented a report on Internet threats, which specifically identified Plaintiff's firm as one that "may particularly threaten the genuine collision parts business" by putting pressure on profit margins. Smith Ex. 1; Knott Dep. 34-35. In a draft document provided to GM prior to the conference, Carlisle further opined that "[t]he name of the game is in controlling the portals" and "[t]he only way to beat this challenge is to retake control of dealer parts management practices." Carlisle Ex. 3.

On May 4, 2000, GM met with Plaintiff, and responded to Plaintiff's prior requests for Parts Data by presenting Plaintiff with a list of "Veto Rights/Boundary Conditions" which Plaintiff would need to accept before GM would consider providing the requested Parts Data. Mackie Ex. 7; Loeffler Ex. 1. GM's "boundary conditions" were designed to impose control over Plaintiff's business model by dictating an "OE-centric" business model that would ensure that the benefits of any Internet-based solutions developed by Plaintiff would be denied to companies manufacturing non-OE parts. *Id.*

On May 5, 2000, senior officials of GM and Ford met and discussed the "threat" Plaintiff's parts locator business posed to their profitability. Pl.'s Mem. at 9. At the meeting, GM shared its "Opportunities and Threats" presentation posed by "Internet start-ups" with Ford. Tudor Dep. 53-55; Tudor Ex. 5. The main threat GM discussed with Ford was that such "Internet start-ups" reduce OEM profits by increasing competition from non-OE parts. Plaintiff's company was identified as one posing such a threat during the meeting. Tudor Dep. 58.

On May 8, 2000, GM met with DCX to discuss its interest in developing a business-to-business ("B2B") proposal. Knott Ex.10. GM was interested in a B2B proposal because it "realize[d] the importance of responding quickly to competitive threats." *Id.* GM told DCX that it viewed Delphi (the parts manufacturing unit that had recently spun off of GM) as a major threat and believed that Delphi would implement a B2B strategy to circumvent GM's parts operations. GM told DCX about its discussions with Plaintiff (which GM viewed as a "direct threat") as well as its initial discussions with

Ford regarding a B2B initiative. *Id.* GM also shared its "Opportunities and Threats" presentation with DCX. Knott Dep. 95-96.

On May 18, 2000, GM and DCX met to discuss Carlisle's proposal for a "Genuine Parts Exchange." Pl.'s Mem. at 9. During the meeting, Carlisle warned GM and DCX that Plaintiff would make it easier in the future to buy non-OE parts; thereby, threatening OEM profit margins. Carlisle further expressed the belief that "it is unlikely that an unorganized consortium of OEs will be able to gain control of [Plaintiff] and guarantee maintenance of its current closed exchange environment." Smith Dep. at 53-55. Carlisle concluded that "the smart response is to counter with the collaborative development of a closed exchange that will trade only in genuine parts, from all partner OEs." *Id.*

Plaintiff argues that Defendants GM, DCX, and Ford recognized that changes in the automotive parts business posed substantial threats to their ability to maintain historic levels of profitability on the sale of replacement parts. Pl.'s Mem. at 9-10. Defendants responded to these threats by jointly creating an OEM-only parts portal (i.e., Marmaduke/OEC) to control the purchase and sale of parts in a way that would suppress the emergence of new forms of competition. *Id.* at 7-8.

Plaintiff argues that Defendants GM, Ford, and DCX, and Bell & Howell created Marmaduke/OEC so that it "[would] be the sole source for accurate OEM data." Pl.'s Mem. at 12. (DCX 001884.) In mid-August 2000, GM prepared the Terms of Agreement for the formation of Marmaduke/OEC. The Agreement provided, *inter alia,* that:

> Technology partners not agreeing to terms for participation in the OE portal will be left to compete against the OE portal in the marketplace, without benefit of OE endorsement or OE catalog or technical service information. (Loeffler Ex. 17.)

A September 14, 2000 draft proposal among Defendants GM, DCX, and Ford, and Bell & Howell provided, *inter alia,* that:

> The 3 OEM's also agree not to participate or support any other automotive parts eCommerce initiative with a similar vision of the Portal. The 3 OEMs further agree not to provide access to the parts catalog data and other related Intellectual Properties to other parties potentially competing with the Portal. Baumgartner Ex. 31 (Pl.'s Mem. at 12.)

6

Moreover, in a memorandum of understanding that led to the formation of OEC,[3] Defendants indicated that Plaintiff has "no OEM data" and "of course this gives OEMs leverage." Tudor Ex. 17.

Defendants GM, DCX, and Ford agreed that they would not grant Plaintiff's data requests unless Plaintiff agreed to their anticompetitive conditions for a business arrangement. Pl.'s Mem. at 12. For example, Defendants noted that, as a result of the "unified" front of GM, Ford and DCX, Plaintiff "will do anything we want[]." Miller Ex. 15. Moreover, because Defendants were unable to coerce Plaintiff's management into acceding to their demands, Defendants engaged in a "divide and conquer" strategy by approaching the senior executives of Plaintiff's parent companies. *Id.* For instance, Mr. John Smith (GM) called Mr. Lloyd Waterhouse (Reynolds) and stated, that if, Plaintiff's founders continued to support Plaintiff as a competitor of Marmaduke/OEC, then "we will not provide the parts data." Waterhouse Dep. 68-77. Furthermore, at a December 14, 2000 meeting with Plaintiff, Mr. Smith further stated (in the presence of Ford and DCX representatives) that GM would maintain its position in withholding Parts Data from Plaintiff. Galbato Dep. 546.

Plaintiff alleges that it requested Parts Data from each Defendant. Pl.'s Mem. at 11. Following each request, however, Plaintiff was informed that Defendants GM, Ford and DCX would continue to withhold Parts Data (refusal to provide Parts Data was confirmed on September 11, 2000 and October 5, 2000). Galbato Dep. 264-66.

(ii) Circumstantial Evidence of Conspiracy

Plaintiff alleges that, in addition to the above-reference direct evidence, circumstantial evidence of a conspiracy exists that demonstrates that Defendants conspired to withhold Parts Data. Pl.'s Mem. at 15. Plaintiff argues that proof of a conspiracy may be established by "circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). Moreover, to prove a conspiracy based on circumstantial evidence, a plaintiff must prove evidence of

---

[3]OEC was formed on December 7, 2000. Jordan Ex. 26.

parallel conduct by the defendants, together with one or more "plus factors." *Petruzzi's IGA Supermarkets v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1232 (3rd Cir. 1993). "Plus factors," for example, can include pretextual explanations of a defendant's conduct. *Id.*

Plaintiff asserts that Defendants GM, Ford, and DCX have engaged in parallel conduct by refusing to grant it Parts Data licenses.[4] Pl.'s Mem. at 16. Moreover, GM, Ford, and DCX gave the identical Parts Data (that Plaintiff requested) to both OEC and other independent businesses whose activities do not involve parts locator services. *Id.* Furthermore, most other major automobile manufacturers have provided Parts Data to Plaintiff. *Id.* Plaintiff, thus, asserts that Defendants have engaged in a common scheme, in that, they have agreed to withhold Parts Data. *Id.*

Plaintiff further argues that Defendants' reasons for their refusal to provide Plaintiff with Parts Data are merely pretextual ("plus factor"). Pl.'s Mem. at 17. Plaintiff alleges pretextual behavior on the part of each Defendant. *Id.* at 17-18. Plaintiff, therefore, asserts that Defendants' parallel conduct in refusing to grant it Parts Data licenses as well as their pretextual reasons given for refusing to deal with Plaintiff, constitute circumstantial evidence of the existence of a conspiracy. *Id.* at 18.

Plaintiff asserts that Defendants' conspiracy unreasonably restrains trade in that Defendants' collective refusal to deal or group boycott is *per se* illegal. Pl.'s Mem. at 19-20. *See e.g., Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). Moreover, in *Toys "R" Us v. Fed. Trade Comm'n,* 221 F.3d 928, 935-36 (7th Cir. 2000), the Seventh Circuit explained that a boycott is *per se* illegal under *Northwest Stationers:*

> without an extensive inquiry into market power and economic pros and cons [when] (1) the boycotting firm has cut off access to a supply, facility or market necessary for the boycotted firm . . . to compete; (2) the boycotting firm possesses a "dominant" position in the market (where "dominant" is an undefined term, but plainly chosen to stand for something different from antitrust's term of art "monopoly"); and (3) the boycott . . .

---

[4] Plaintiff contends that after the lawsuit was filed, DCX offered it a Part Data license, but only on the condition that Plaintiff dismiss its action against DCX and release DCX from all liability for its conspiratorial actions. Pl.'s Mem. at 16.

cannot be justified by plausible arguments that it was designed to enhance overall efficiency.

Plaintiff, thus, alleges that Defendants collectively agreed to deny Plaintiff the Parts Data it needed to operate it parts locator service. Pl.'s Mem. at 20. Moreover, Defendants' Parts Data is critical and is only available in a commercially usable form from each Defendant. *Id.* Furthermore, each Defendant is clearly "dominant" with respect to Parts Data and there is no justifiable efficiency argument for Defendants' collective refusal to deal. *Id.*

(b) Plaintiff's second argument is that pursuant to the Sherman Act, Defendants' have engaged in a conspiracy to monopolize. Pl.'s Mem. at 20. Under the Sherman Act, a conspiracy claim requires proof of: (1) a combination or conspiracy; (2) an overt act in furtherance of the conspiracy; and (3) a specific intent to monopolize. *See, e.g., Am. Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946). A plaintiff alleging a conspiracy to monopolize must show the existence of an agreement to engage in illegal conduct. *Id.* at 810.

Plaintiff alleges that all of the elements needed to prove a conspiracy claim have been satisfied. Pl.'s Mem. at 21. For instance, Defendants conspired to exclude Plaintiff as a competitor and Defendants have engaged in anticompetitive acts in furtherance of a conspiracy. *Id.* Furthermore, Defendants have acted with the specific intent to monopolize by foreclosing Plaintiff from commercializing its product through "conduct that has no legitimate business justification but to destroy or damage competition." *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp.2d 27, 45 (D.C. Cir. 1998).

(c) Plaintiff's third argument is that, even if Defendants acted unilaterally, their actions constitute unlawful acts of attempted monopolization and violations of the "essential facilities" doctrine. Pl.'s Mem. at 21. Plaintiff asserts, however, that even though these "unilateral conduct" claims are well-supported in the record, it seeks entry of a preliminary injunction based on the evidence of Defendants'

conspiracy. *Id.* Therefore, Plaintiff intends to present evidence on its conspiracy claims, but reserves the right to offer evidence in support of its other claims at trial. *Id.*

(2) Plaintiff argues that it lacks an adequate remedy at law, in that, without access to Defendants' Parts Data, it cannot remain in business. Pl.'s Mem. at 22. Moreover, although the destruction of Plaintiff's business will result in monetary harm, the economic consequences of its exclusion from the market will be difficult to ascertain with precision. *See, e.g., Hyatt Corp. v. Hyatt Legal Servs.*, 736 F.2d 1153, 1158 (7th Cir. 1984) (loss of sales or potential growth would be "remarkably difficult to convert into damages"). Furthermore, as a new business entrant focused on forging early and strong customer ties, Plaintiff will suffer irreparable harm from injury to its goodwill with automobile dealers and repair shops. *See, e.g., Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1120 (7th Cir. 1997) (injury to goodwill constitutes irreparable harm for which there is no adequate remedy at law).

Plaintiff further argues that even if it could obtain access to Defendants' Parts Data, the delay is likely to permanently damage Plaintiff's relationship with over 250 dealers who have already signed contracts with Plaintiff. Pl.'s Mem. at 22. Accordingly, injunctive relief is appropriate because Plaintiff does not have an adequate remedy at law. *Id. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 522 (4th Cir. 1994) ("when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.").

(3) Plaintiff argues that the balance of harm favors entry of a preliminary injunction because Plaintiff cannot remain in business without Defendants' Parts Data. Pl.'s Mem. at 22. In addition, Plaintiff will be harmed because it will not be a viable competitor in the marketplace. *Id.* In contrast, Plaintiff assert that Defendants will not suffer any harm. *Id.*

Plaintiff further asserts that the public interest favors entry of a preliminary injunction. Pl.'s Mem. at 22. A preliminary injunction is warranted because Defendants' documents memorialize an

agreement to deny Parts Data to all competitors who are unwilling to capitulate to their demands. *Id.*
Moreover, OEC will be able to charge higher prices than would otherwise prevail and Defendants will
be able to keep automotive parts prices high by thwarting new forms of competition. *Id.* Moreover,
Defendants will be able to stop those advancements that enable independent collision shops (and their
customers) to obtain less-expensive non-OE parts more efficiently. *Id.* 22-23.

C.    *Prayer for Relief.*

Plaintiff, therefore, respectfully requests that the Court enter an order (1) enjoining each
Defendant, and all those acting in concert with them, from jointly refusing to deal with Plaintiff with
respect to factory parts pricing data and Parts Data; (2) directing each Defendant, and all those acting
in concert with them, to provide Parts Data to Plaintiff in accordance with the ordinary and customary
terms followed heretofore in the marketplace, and (3) enjoining each Defendant (including OEC) from
using Parts Data in its business in connection with an advanced parts locator service until 180 days after
such time as Plaintiff has been given access to Parts Data by each of the OEM Defendants for use as it
relates to its advanced parts locator service.[5] (Pl.'s Motion at 3, Am. Compl. at 24). At oral argument:
Plaintiff requested certain additional mandatory injunctive relief, which in view of the court's ruling,
*infra,* need not be addressed further herein.

III.    *Defendants' Joint Memorandum in Opposition to Plaintiff's Motion for Entry of a Preliminary
Injunction*

A.    *Introduction*

In their response memorandum, Defendants contend that Plaintiff cannot offer any clear evidence
of its antitrust claims. Defs.' Mem. at 1. For instance, there is no evidence of unreasonable restraint of
trade, nor have Defendants conspired to withhold their respective proprietary Parts Data from Plaintiff.
*Id.* In fact, long before the alleged conspiracy, GM told Plaintiff's management that it would not grant

---

[5]At oral argument, Plaintiffs did not mention (3) above in its request for relief.

it a Parts Data license. *Id.* GM did so because Plaintiff intended to sell genuine GM parts side-by-side with non-OE, knock off "aftermarket" parts in a virtual store on the Internet. *Id.* Defendants assert that this would cut GM dealers out of their role as the sole providers of genuine GM parts and cause serious harm to GM, its dealers and their customers. *Id.* As early as February 2000, Plaintiff's founders knew that if it pursued its aftermarket plan, Plaintiff would "not only fail to obtain" Parts Data from GM and other OEMs, but would "face open opposition from them." *Id.*

Defendant asserts that Plaintiff now attributes the consequences of its own flawed business plan to an alleged conspiracy. Defs.' Mem. at 2. Plaintiff, thus, attempts to allege a conspiracy that is in contravention of the facts in this case. *Id.* For example, the record is clear that GM is the only OEM that would not grant Plaintiff a Parts Data license. *Id.* Ford offered Plaintiff a temporary Parts Data license, and DCX offered Plaintiff a long-term Parts Data license. *Id.* Plaintiff refused the license offers from Ford and DCX, and decided not to accept a Parts Data license with any one OEM unless Plaintiff could do so with all three OEMs simultaneously. *Id.*

Defendants thus set forth facts seeking to support the following points (including those stated in the preceding two paragraphs): Each OEM and its dealers sell vehicles and original equipment parts, and each OEM uses its proprietary parts data to promote those sales; there are many parts locators available to dealers and collision shops; R&R and ADP agreed to stop competing with each other, and formed a dot.com type of joint venture; the internet creates a virtual store; ChoiceParts knew that it had no licenses from the OEM's, yet designed its product to use OEM data anyway; Ford and DCX each offered to license parts data to ChoiceParts, but ChoiceParts refused those offers; ChoiceParts' product does not require OEM parts data to function; The OEM's formed defendant OEConnection to provide parts locating for OE parts only; GM, Ford and DCX did not conspire to deny parts data to ChoiceParts; and, there is no emergency justifying mandatory injunctive relief. Defs.' Mem. at 1-10.

B.    *Arguments*

(1) Defendants present the following arguments that Plaintiff seeks unprecedented mandatory injunctive relief that subverts the purpose of a preliminary injunction by dramatically and irreparably changing the status quo. Defs.' Mem. at 11.

"(T)he granting of a preliminary injunction is the exercise of a very far reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 389 (7th Cir. 1984).

"The purpose of a preliminary injunction is to preserve the object of controversy in its then existing condition, i.e., to preserve the status quo." *EEOC v. City of Janesville*, 630 F.2d 1253, 1259 (7th Cir. 1980). Defendants, however, argue that Plaintiff seeks to alter the status quo by asking the Court to "direct[] each manufacturer defendant . . . immediately to provide Parts Data to Plaintiff." Am. Compl. ¶ 24. Defendant contends that Plaintiff does not need to obtain Parts Data in order to build a functional part locator (because its dealer customers already have the data in their DMSs). Defs.' Mem. at 11. Rather, Plaintiff only seeks to obtain Defendants' proprietary data so that it can incorporate the Parts Data into its own software which will irreparably alter the way GM and Ford do business. *Id.* at 11-12.

Defendants next argue that the antitrust laws impose no general requirement that Defendants slit their throats by helping Plaintiff sell non-OE parts. Defs.' Mem. at 12. *See, e.g., United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919) (A "manufacturer may "freely" choose the "parties with whom he will deal"); *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 375-79 (7th Cir. 1986) (No duty to assist a competitor). Defendants argue the Plaintiff has not cited, and Defendants are unaware of, any case in which a court has issued a preliminary mandatory injunction ordering a company to provide its proprietary data to another company.

Defendants further assert that every court faced with such a request, as Plaintiff makes here, has denied it, ruling that the data owner's interests in protecting its data and its business, as well as preventing "free riding," justify a decision not to provide the requested data. *See, e.g., Morris Communications Corp. v. PGA Tour,* 117 F. Supp.2d 1322, 1329-30 (M.D. Fla. 2000) (denying mandatory preliminary injunction where "it appears that Defendant's refusal to deal . . . is motivated by a legitimate desire to protect its property interest rather than a predatory or anticompetitive animus"); *City of College Station, Tex. V. City of Bryan, Tex.* 932 F. Supp. 887, 889 (S.D. Tex. 1995) (denying preliminary injunction in Sherman Act case where Plaintiff "has not met its burden to show that [Defendants] lack legitimate business reasons."

Defendants assert that Plaintiff does not address the proper legal standard applicable to its request for mandatory preliminary injunctive relief. Defs.' Mem. at 12. Mandatory injunctions "are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds." *W.A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958). Therefore, such relief is inappropriate unless "the law and facts clearly favor the plaintiff." *Morgan v. Drew*, No. 91 CV 20167, 1992 U.S. Dist. LEXIS 4689, at *3 (N.D. Ill. Mar. 17, 1992); *see Standberry v. Coler,* No. 87 C 1357, 1987 U.S. Dist. LEXIS 3965, at *33 (N.D. Ill. May 14, 1987) (A "mandatory injunction . . . should issue only in exceptional circumstances and where the rights of the parties are entirely clear.")

Stated another way, "[i]rreparable loss resulting from refusal to accord the plaintiff a new status, as distinguished from interference with rights previously enjoyed by him, does not furnish the basis for interlocutory relief." *Warner Bros. Pictures, Inc. v. Gittone,* 110 F.2d 292, 293 (3rd Cir. 1940) (reversing preliminary relief that "was not to preserve the status quo but rather to alter the prior status of the parties fundamentally"). In fact, a "mandatory injunction is similar to a mandamus in all essential respects." *Gary Joint Venture v. Friendly Ice Cream Corp.,* No. 87 C 886, 1987 U.S. Dist. LEXIS 5351 at *12

(N.D. Ill. June 15, 1987). Defs.' Mem. at 13. Moreover, after a trial on the merits, this kind of relief is extraordinarily "rare." *In re Brand Name Prescription Drug Antitrust Litig.*, 123 F.3d 599, 610 (7th Cir. 1997) ("Rare" to require defendants to do anything beyond cessation of illegal activity).

Defendants, therefore, assert that Plaintiff cannot meet this heightened standard because a preliminary injunction will hurt (1) dealers, who will see their parts sales decline, (2) OEMs, who will have to give their proprietary data to a company that will promote aftermarket parts sales by their competitors, and (3) consumers, who will suffer the consequences of lower-quality parts. Defs.' Mem. at 13. In addition, a preliminary injunction is not warranted because Plaintiff's requested relief does not flow from its conspiracy claims. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584 n.7 (1986) (Plaintiff must show that "the conspiracy caused [it] an injury for which the antitrust laws provide relief"). Furthermore, Defendants argue that Plaintiff admits that the alleged harm would have been caused solely by GM's unilateral decision not to grant a license. *See Movitz v. First Nat'l Bank of Chicago*, 148 F.3d 760 (7th Cir. 1998) (alleged act must be the proximate cause of the alleged harm).

(2) Defendants present the following arguments in support of their assertion that Plaintiff has an adequate remedy at law.

(a) Defendants first argue that, by Plaintiff's own admission, its alleged pre-trial damages are calculable. Defs.' Mem. at 14. For example, two months after filing this action, Mr. Akash Shah, one of Plaintiff's Vice-Presidents, prepared an analysis for Plaintiff's Board of Directors entitled the "Revenue Walk," which quantified the alleged financial impact of the delay in obtaining Defendants' Parts Data. *Id.* (Shah Dep. 37-42). Mr. Shah calculated the loss (as of June 2001) to be $1,854,000. *Id.* (DX1161.) He calculated the damages by multiplying Plaintiff's expected revenue per customer by its expected number of customers. *Id.* Defendants, therefore, contend that the Court should deny Plaintiff's

motion because the alleged injuries can be quantified. *See, e.g., Kowalski v. Chicago Tribune Co.*, 854 F.2d 168, 171 (7th Cir. 1988).

(b) Defendants next assert that Plaintiff's claims that it will lose goodwill, suffer impaired customer relations, or go out of business are without merit because they fail to demonstrate an inadequate legal remedy. Defs.' Mem. at 14. Plaintiff has not demonstrated that it has any "goodwill" to lose before trial because it has no customers, and according to Plaintiff's own allegations, it has no product to sell. *Id.* (Shah Dep. 62). Moreover, with respect to a start-up business such as Plaintiff's, "[t]he loss of goodwill of a business operated over a short period of time is usually compensable in damages." *See DFW Metro Line Servs. v. Southwestern Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990) (lost goodwill of a plaintiff that had only been in business for one-and-a-half years was calculable).

Defendants argue that Plaintiff's claim that Defendants' withholding of Parts Data may damage its relationships "with the over 250 dealers who have already signed contracts with [Plaintiff]" is without merit. Defs.' Mem. at 14. Defendants contend that Plaintiff's reputation with these dealers is the result of its own actions, in that, Plaintiff mislead those dealers by signing contracts late in 2000, at a time when it knew that it did not have Parts Data licenses that it claims are essential. *Id.* Furthermore, because Plaintiff has valued its business as being worth $25 million, it has an adequate remedy at law, if it were to go out of business. *Id. See Baghdady v. Robbins Futures, Inc.*, No. 97 C 8794, 1998 U.S. Dist. LEXIS 1710, at *4-*5 (N.D. Ill. Feb. 9, 1998) ("Because Plaintiffs' alleged injuries are all similarly amenable to pecuniary valuation, an injunction is not warranted").

(3) Defendants present the following arguments in support of their assertion that Plaintiff has not been irreparably harmed or injured.

A plaintiff seeking a preliminary injunction must prove an "irreparable harm" that is distinct and independent from an "inadequate remedy at law." *See, e.g., Kellas v. Lane*, 923 F.2d 492, 493 (7th Cir.

1990) "Only if [plaintiff] will suffer irreparable harm in the interim– that is, harm that cannot be prevented or fully rectified by the final judgment after trial–can he get a preliminary injunction." *Roland*, 749 F.2d at 386. The "irreparable injury" prong requires Plaintiff to prove an emergency warranting the imposition of equitable relief before trial. *Id.*

(a) Defendants first argue that Plaintiff addresses the irreparable injury analysis only by making a conclusionary statement that "as a new entrant focused on forging early and strong customer ties, [Plaintiff] will suffer irreparable harm from injury to its goodwill with automobile dealers and repair shops." Defs.' Mem. at 15. Defendants assert that Plaintiff's statement fails because Plaintiff's action demonstrates that there is no "emergency" in that its company will not go out of business before trial. *Id.* at 15-16. Furthermore, Plaintiff has a steady stream of revenue from its parent companies' existing locator products that it now owns (e.g., OneTouch and NPL). *Id.* at 16.

Defendants further assert that Plaintiff has not been irreparably harmed because it has been testing and marketing new products. Defs.' Mem. at 16. In fact, Plaintiff continues to work on "economical connectivity solutions that are admittedly critical to its success. *Id.* (Burrus II Dep.16.) Moreover, Plaintiff can also sell its product to import-automobile dealerships. *Id.* Furthermore, Plaintiff's management recently advised its Board of Directors that its new business plan "allows for the development of premium products and funding of the lawsuit." *Id.* (DX1140, 9.)

(b) Defendants next argue that any harm Plaintiff has purportedly suffered from is self-inflicted. Defs.' Mem. at 16. "If the harm complained of is self-inflicted, it does not qualify as irreparable." *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3rd Cir. 1995) (*citing* 11A Charles A. Wright, Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (1995)).

Defendants assert that Plaintiff erred when it presumed that it could obtain Parts Data. Defs.' Mem. at 16. In fact, Plaintiff had known since February 2000 that GM refused to grant it a Parts Data license because Plaintiff intended to promote the sale of non-OE parts. *Id.* (DX1174, 3.) Plaintiff,

however, continued to design its product to incorporate OE Parts Data. *Id.* at 16-17. Defendants, therefore, contend that Plaintiff must live with the consequences of its actions, at least until a trial on the merits. *See, e.g, Morris,* 117 F. Supp.2d at 1330-31; *Caplan,* 68 F.3d at 839 ("Because [movants] have acted to permit the outcome which they find unacceptable, we must conclude that such an outcome is not an irreparable injury").

(4) Defendants present the following arguments asserting that Plaintiff cannot prevail on its conspiracy claim (Section 1 of Sherman Act). Def.'s Mem. at 18. In order to prove such a claim, a plaintiff will need to establish "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *MCM Partners v. Andrews-Bartlet & Assocs.,* 161 F.3d 443, 448 (7th Cir. 1998). (citations omitted.) Introductorily, Defendants maintain that, at the threshold, ChoiceParts cannot establish the requisite unreasonable restraint of trade. Defendants' maintain that dealers already can access the Parts Data in question and it was ChoiceParts that failed to design its system to take advantage of that fact. Moreover, there is significant competition among parts locators, and other methods of communication, such as the telephone, would prevent anti-competitive harm. Indeed, Defendants' assert, ChoiceParts itself admits that its primary competition is the telephone.

(a) Defendants initially argue that Plaintiff's conspiracy claim fails because Defendants acted in dramatically different ways in response to Plaintiff's Parts Data license requests. Defs.' Mem. at 18. For instance, GM has consistently denied the Parts Data license, Ford offered a limited license, and DCX is willing to grant a license. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 593 (Courts cannot "infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct"). In addition, Defendants assert that Plaintiff would have the burden of presenting "evidence that 'tends to exclude the possibility' that" any of the OEMs "acted independently." *Id.* at 588. Plaintiff cannot do so here because it is undisputed that GM denied

18

Plaintiff's request for Parts Data before Defendants ever communicated with each other regarding the formation of OEC.

Defendants further assert that with respect to OEC, Plaintiff has acknowledged that OEC does not have Parts Data to license. Defs.' Mem. at 19. In addition, the alleged conspiratorial activity occurred before OEC was incorporated in December 2000. *Id.* Therefore, Plaintiff's attempt to avoid this issue by claiming that Defendants engaged in "coordinated action through OEC" fails because there is no evidence to support these allegations. *Id.*

(b) Defendants's second argument is that Plaintiff has no direct evidence of a conspiracy. Defs.' Mem. at 19. In order to prove a conspiracy, a plaintiff must produce evidence that "tends to exclude the possibility of independent action by [the defendants]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that [the defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).

Defendants assert that Plaintiff has no "compelling direct evidence" of a conspiracy. Defs.' Mem. at 19. "Direct evidence is evidence which, if believed, resolves a matter in issue." 1 *McCormick on Evidence* 641 (5th ed. 1999). For instance, none of the alleged evidence cited by Plaintiff establishes the existence of any agreement, much less one that violates the antitrust laws. *Id.* Defendant, therefore, asserts that contrary to what Plaintiff seeks, the Court cannot infer an agreement when the actual conduct in the case will not permit such an inference. *Id.*

(c) Defendants' third argument is that Plaintiff's allegation that Defendants engaged in "parallel conduct"does not constitute circumstantial evidence of an agreement to withhold Parts Data. Defs.' Mem. at 20. Defendants, thus, argue that Plaintiff distorts the record by falsely stating that each Defendant refused to grant Plaintiff a Parts Data license. *Id.* This assertion is contrary to the record which demonstrates that each Defendant responded to Plaintiff uniquely and independently.

Furthermore, Defendants' responses to Plaintiff's request for Parts Data licenses do not constitute a "plus factor," in that, they cannot be viewed as being pretextual. *Id.*

(d) Defendants fourth argument is that if Defendants had agreed not to provide Parts Data to Plaintiff, such an agreement would have been lawful. Defs.' Mem. at 21. The rule of reason prevails in antitrust analysis, which requires a plaintiff to (1) define a relevant market, (2) show that defendants have market power in that market, and (3) show that, on balance, the challenged agreement's anticompetitive effects outweigh its procompetitive benefits. *See, e.g., Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir. 1995). The Supreme Court has rejected any broad application of the per se rule, that is, condemnation without extensive analysis of market power or competitive effects, to allegations such as those alleged in this case. *See Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 294 (1985) (rejecting "per se" rule in a concerted refusal to deal case), *followed by Toys R Us,* 221 F.3d at 935 (applying per se rule because defendant has no justification for restraint); IIIA Phillip Areeda & Herbert Hovenkamp, *Antitrust Law,* 213-14 & n.49 (1996) (The "essential facility doctrine . . . is not a 'per se' rule in any sense," even if "collaboration" is alleged under Sherman Act § 1"). The rule of reason applies when the alleged restraint is "ancillary" to a lawful transaction. *L.A.P.D., Inc. v. Gen. Elec. Corp.,* 132 F.3d 402, 405 (7th Cir. 1997).

Defendants assert that any concerted refusal to deal is ancillary to the formation of a legitimate joint venture, namely, OEC, and must be analyzed under the rule of reason. Defs.' Mem. at 21. Defendants argue that forming OEC was an efficiency-enhancing integration of assets. *Id.* Moreover, this type of agreement would prevent "free riding" in that if Parts Data was incorporated into Plaintiff's collision shop product, aftermarket parts suppliers would be able to increase their sales at the expense of genuine OE parts, without compensating the OEMs for use of their Parts Data. *Id.* (Teece Rep. 40-41.) Defendants, therefore, contend that case law recognizes that the prevention of "free riding"

justifies the type of agreement alleged in this case. *See Chicago Prof'l Sports Ltd. Partnership v. Nat'l Basketball Ass'n,* 961 F.2d 667, 674 (7th Cir. 1992).

(e) Defendants fifth argument is that Plaintiff cannot establish a conspiracy to monopolize claim under Section 2 of the Sherman Act. Defs.' Mem. at 21. Defendants allege that Plaintiff's conspiracy to monopolize claim fails for the same reasons as its Section 1 claim, in that, Plaintiff cannot show an anticompetitive agreement. *Id.* In addition, a Section 2 conspiracy claim cannot be considered a distinct statutory offense from that of a Section 1 conspiracy claim if it is based on the same conduct. *Id.* at 21-22. *See, e.g., NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 139 (1998) (*citing* Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651e, at 81-82 (1986)). Therefore, Defendants allege that Plaintiff cannot succeed on its Section 2 claim.

(5) Defendants argue that the balance of harms favors denial of Plaintiff's requested relief. Defs.' Mem. at 22. Defendants assert that the harm to GM and Ford would be substantial in that they would lose control of their proprietary Parts Data and be forced to assist Plaintiff in promoting the sale of non-OE parts to the detriment of their own OE parts sales. *Id.* As to DCX and OEC, a mandatory injunction would limit their ability to make unilateral decisions. Further, argue Defendants, Plaintiff has never explained how this court would formulate the appropriate license terms and license fees in fashioning such an unprecedented order, a monumentally complex task because the OEMs have never licensed their data for a use of the type that Plaintiff proposes. (Defendants' memo p. 22).

Additionally, asserts Plaintiff, once dealers have its system, it will be hard, if not impossible, to take it from them after trial. *Id.* Defendants would be harmed after collision shops implemented Plaintiff's locator system, because these shops would ultimately purchase greater numbers of aftermarket and salvage parts. *Id.* Thus, dealers would suffer a substantial loss in OE parts sales that traditionally provide dealers with much of their profit. *Id.*

By contrast, Defendants assert that Plaintiff would suffer no harm from waiting for a trial on the merits. Defs.' Mem. at 22. For instance, Plaintiff can continue to sell OneTouch and NPL products, and test its new product. *Id.* Moreover, Plaintiff can sell its product to thousands of automobile import dealerships. *Id.* Therefore, Defendants assert that the risk of a grant of such extraordinary relief clearly outweighs the risk that relief will be wrongly denied. *Id.*

Defendants further assert that Plaintiff has unclean hands because it made misleading statements regarding its own business and that of Defendants. Def.'s Mem. at 22. Plaintiff also misappropriated Defendants' Parts Data in late 2000. *Id.* (DX2123, DX2124, DX2125.) Furthermore, after the lawsuit had been filed, Plaintiff ended its Dayton pilot that worked well without Defendants' Parts Data. *Id.* Therefore, Defendants contend that Plaintiff's inequitable conduct bars its request for injunctive relief.

(6) Defendants argue that a mandatory injunction is contrary to the public interest. Defs.' Mem. at 23. In an antitrust action, the public interest prong focuses on protecting markets and promoting competition. *See Morris*, 117 F.Supp.2d at 1331.

Defendants assert that granting the requested relief will impair competition. Defs.' Mem. at 23. For instance, Plaintiff's expert stated that an injunction stripping OEC of access to Parts Data would delay OEC's market entry, and thus delay competition. *Id.* (Nelson II Dep. 549-50.) Under Plaintiff's theory, the requested relief against OEC would result in a court-sanctioned monopoly which would clearly be contrary to the public interest. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

Defendants argue that changing the status quo by ordering Defendants to provide their propriety Parts Data before trial would irreparably harm GM's and Ford's dealers' parts networks, which, in turn, would harm customers. Defs.' Mem. at 23. Moreover, aftermarket parts makers would "free ride" on Defendants' efforts and create a new rule that would reduce the incentive for business innovation. *Id.* Therefore, Defendants contend that if Plaintiff's requested relief is granted, it will result in serious injury

to Defendants' parts distribution systems, the nearly 20,000 dealerships selling OE parts, and those dealers' customers. *Id.*

IV.    *Plaintiff's Reply in Support of its Motion for Entry of a Preliminary Injunction*

In its reply memorandum, Plaintiff presents, *inter alia*, the following arguments:

(A) Plaintiff first argues that Defendants have misrepresented the nature of Plaintiff's business and the manner in which it proposes to use Defendants' Parts Data. Pl.'s Reply at 2. Plaintiff contends that it does not sell parts over the Internet and in fact, its business is to provide software and technology that will enable car dealers and collision shops to enhance the efficiency of the processes they currently use to locate, purchase and sell automotive parts. *Id.*

(B) Plaintiff next argues that it needs Defendants' Parts Data in order to successfully operate its parts locator business. Pl.'s Reply at 3. OEC's expert issued a report stating: "[Plaintiff's software] design requires a centralized database of all manufacturer parts data . . . ." *Id.* (Rumelt Report ¶ 1.11.) Defendants, however, argue that Plaintiff should have stopped production of its product and started over with a "distributed" design. *Id.* Plaintiff, however, contends that Defendants' argument ignores the existence of their conspiracy and that Defendants would have conspired against Plaintiff even if it had developed a distributed system. *Id.* Thus, Defendants' intent is to control Plaintiff's business model and changing the design of its software would not alleviate Defendants' efforts to this end. *Id.*

(C) Plaintiff argues that Defendants have attempted to postulate after-the-fact theories in order to negate evidence of Defendants' conspiracy. Pl.'s Reply at 4. For instance, Defendants attempt to re-write the record to create the false impression that each Defendant acted in an "entirely different" manner when responding to Plaintiff's request for Parts Data. *Id.* Plaintiff, however, asserts that each Defendant acted in the same manner by refusing to make a *bona fide* offer to license its Parts Data to Plaintiff. *Id.* While DCX did offer Plaintiff a license, the offer required that Plaintiff release DCX from the conspiracy at issue. *Id.* at 5. Moreover, Ford's temporary license offer (for testing purposes) was not responsive to Plaintiff's request because it did not allow enough time to properly perform testing.

*Id.* Plaintiff, thus, alleges that these license offers were made after it had charged Defendants with conspiracy and collusion. *Id.* Therefore, Defendants' independent claims of acting differently with respect to license offers merely reflect an effort to cover up their conspiracy. *Id.*

Plaintiff asserts that Defendants also attempt to justify their conspiracy by claiming that it was "ancillary" to a "legitimate" joint venture and should therefore be judged by the "rule of reason." Pl.'s Reply at 6. Defendants make this argument because the antitrust laws do not allow any explanation or justification for agreements that are *per se* unlawful. *See, e.g., Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982).[6] Plaintiff contends that Defendants' argument is contradicted by the record indicating that Defendants formed their venture for an illegal purpose and that the venture has had an anticompetitive effect. *Id.* Moreover, Defendants rejected Plaintiff's offer to use their Parts Data on a limited basis and insisted that Plaintiff refrain from engaging in business activities which were not related to Defendants' Parts Data. *Id.* Plaintiff, therefore, asserts that this type of restriction cannot be considered "ancillary" to a "legitimate" joint venture. *Id.*

Plaintiff further argues that Defendants' "free rider" argument is another *post hoc* justification because Plaintiff has agreed not to use Defendants' Parts Data for side-by-side comparisons with non-OEM parts or for any other "improper" purpose. Pl.'s Reply at 6. In addition, any "free riding" could be prevented through independent limits on the licenses granted by Defendants. *Id.* Therefore, Plaintiff contends that Defendants did not need to agree to withhold Parts Data from Plaintiff in order to prevent "free-riding" by non-OEM suppliers. *Id.*

Plaintiff further asserts that Defendants attempt to justify their conspiracy by arguing that Plaintiff "consistently refused" to accept a license from any of the three Defendants is belied by the record. Pl.'s Reply at 7. Thus, even though Defendants cite an e-mail message from Plaintiff's CEO,

---

[6]Defendants argue that the *Matsushita* standard applicable to conspiracy cases based on ambiguous circumstantial evidence should be applied in this case. Defs.' Mem. at 18. However, Plaintiff asserts that *Matsushita* does not apply because there is alleged direct evidence of Defendants' conspiracy. *Id.*

Mr. Galbato, they ignore his testimony regarding the message. *Id.* As Mr. Galbato explained, he believed that "there was something going on" between Defendants and they were playing "games" with Plaintiff's Parts Data requests. *Id.* (Galbato Dep. 598-99.) Furthermore, another one of Mr. Galbato's e-mail messages indicate that Plaintiff should try to obtain pilot parts licenses from all three Defendants simultaneously in order to protect itself from Defendants' conspiratorial games. *Id.* Therefore, Plaintiff asserts that it has always been willing to accept *bona fide* data licenses from each Defendant.

(D) Plaintiff asserts that without a preliminary injunction, Plaintiff will not remain a viable business. Pl.'s Reply at 7. Plaintiff argues that it cannot afford to wait for a trial on the merits because recently prepared auditors' financial statements indicate that the company will be unable to continue as an ongoing business unless it obtains judicial relief. *Id.* Moreover, the auditors' reports indicate that Plaintiff will run out of money in three to four months and Plaintiff has already been forced to lay off employees. *Id.* Furthermore, Plaintiff's CEO and Director of Marketing have resigned. *Id.*

Plaintiff argues that even if its company survives through the preliminary injunction hearing, it is doubtful that it will survive through a trial on the merits. Pl.'s Reply at 8. Plaintiff, thus, asserts that even if it is successful at trial, that it will still take four to five months from that point before Plaintiff can obtain Parts Data to begin an operational roll-out of its advanced parts locator. *Id.* As a result, Plaintiff will be unable to begin an operational roll-out to Defendants' dealers until the year 2003. *Id.*

(E) Plaintiff argues that it will suffer irreparable harm to its reputation and customer goodwill because it has been unable to produce a product for which 250 dealers signed up for more than a year ago. Pl.'s Reply at 9. Plaintiff also asserts that Defendants' argument that Plaintiff does not have any customer goodwill to lose because it is not actively selling its software is not supported by case law. *Id.* For example, in *Bascom Food Prods. Corp. v. Reese Finer Foods, Inc.*, 715 F. Supp. 616, 636-640 (D.N.J. 1989), the court entered a mandatory preliminary injunction requiring that the defendant supply a product to a new entrant in the market. The court explained that mandatory relief was necessary to prevent the plaintiff from suffering "incalculable" damage to its reputation and goodwill. *See, e.g.,*

*Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2nd Cir. 1995) (mandatory relief was necessary to prevent the loss of the plaintiff's prospective goodwill because the plaintiff would otherwise "lose an opportunity to become a major publisher of children's books" and to "attract additional authors and owners of [children's] characters"). *Id.* at 38.

(F) Plaintiff asserts that it cannot be made whole for the full amount of damages it has suffered. Pl.'s Reply at 10. Plaintiff argues that contrary to Defendants' assertion, it cannot quantify its damages. *Id.* Defendants assert that Plaintiff can quantify its damages because an employee created a projection comparing Plaintiff's actual revenues in early 2001 against estimated revenues in a December 2000 budget. *Id.* Plaintiff asserts that the revenue projection was never intended as an estimate of the damages Plaintiff has suffered as a result of Defendants' conspiracy. *Id.*

In addition, even though Plaintiff can quantify some of its damages, it will suffer irreparable harm without injunctive relief. *Id. See, e.g., Roland*, 749 F.2d at 386 (7th Cir. 1984) (irreparable harm is "harm that cannot be prevented or fully rectified by the final judgment after trial . . . The question is . . . whether the plaintiff will be made whole if he prevails on the merits and is awarded damages."); *see also, Cleveland Hair Clinic, Inc. v. Puig*, 968 F. Supp. 1227, 1246-47 (N.D. Ill. 1996) (damages due to loss of future customers and revenues "will be extraordinarily difficult if not impossible to ascertain with any degree of reliability").

(G) Plaintiff argues that without preliminary injunctive relief, it will not be able to effectively compete with OEC. Pl.'s Reply at 11. For instance, OEC's dealer-to-collision product which is similar to that of Plaintiff's is already available in the marketplace. *Id.* Moreover, Defendants have told dealers that OEC's parts locator product will be available during the first quarter of 2002. *Id.* Therefore, Plaintiff contends that it is unlikely that it will be able to implement its parts locator until 2003, at which time, Defendants' head start, vast resources and ability to offer dealer incentives will preclude Plaintiff from competing with OEC. *Id.*

(H) Plaintiff argues that the requested relief is within the Court's authority. Pl.'s Reply at 13. For instance, mandatory injunctive relief is a well-established remedy for anti-trust violations. Section 16 of the Clayton Act gives courts broad authority to award injunctive relief to private parties suing for antitrust violations. 15 U.S.C. § 26. *See, e.g., California v. Am. Stores Co.,* 495 U.S. 271, 283-85 (1990). Moreover, the Seventh Circuit has also recognized that federal courts have broad discretion to award mandatory injunctive relief in antitrust cases. *See, e.g., Trabert & Hoeffer, Inc. v. Piaget Watch Corp.,* 633 F.2d 477, 486 (7th Cir. 1980). Therefore, Plaintiff asserts, that as indicated by the referenced case law, the Court is empowered to grant the relief requested, which cannot be viewed as being "extraordinary" for an antitrust case like this involving an unlawful conspiracy. The Plaintiff alleges, moreover, while some of the non-antitrust cases cited by Defendants refer to a reluctance to grant mandatory injunctive relief, none provide any meaningful analysis of the issue. Indeed, Plaintiff claims the Seventh Circuit has never squarely addressed the question of whether a heightened burden of proof applies to requests for mandatory injunctive relief. In any event, the issue is immaterial here, Plaintiff asserts, where ChoiceParts seeks relief pursuant to Section 16 of the Clayton Act.

(I) Plaintiff argues that there is no factual basis for Defendants' assertions that Plaintiff has "unclean hands." Pl.'s Reply at 14. Plaintiff further asserts that, as a matter of law, "unclean hands" is not a defense to a Sherman Act violation. *See, e.g., Kiefer-Steward Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 214-24 (1951). Thus, because federal courts have consistently "declined to permit the unclean hands defense in antitrust suits where injunctive relief is sought," Plaintiff asserts that it should not apply herein. *Chrysler Corp. v. Gen. Motors Corp.,* 596 F. Supp. 416, 419 (D.C. Cir. 1984).

(J) Plaintiff's Supplemental Reply Letter.

Regarding certain of Defendants' adequate remedy at law contentions:

Plaintiff argues that Defendants' assertion that "[Plaintiff's] management valued the entire company when it was necessary to do so for income taxes" is without merit. Pl.'s Ltr. dated 12/18/01; Defs.' Resp. at 11. In support of its position, Defendants rely on a document entitled "Valuation of

Segments . . ." (Defs.' Ex. DX 180b). Plaintiff contends, however, that the referenced document has no connection to any "income tax purposes." Pl.'s Ltr. dated 12/18/01. Rather, the document was an internal estimate of a range of potential valuations developed for the purpose of negotiations for a potential business venture based only on Plaintiff's first generation of expected products. *Id.* Plaintiff, further asserts that business negotiations such as these reflect a variety of factors that are typically irrelevant to a calculation of damages caused by an antitrust violation. *Id.* In addition, the fact that the estimated value of Plaintiff's company varies to such a large extent (valued at between $105 million and $180 million) belies Defendants' argument that Plaintiff can readily ascertain the full measure of its damages. *Id.*

Plaintiff also argues that Defendants' contention that "[Plaintiff] asserted that the company was worth $25 million when it established a stock option plan" is erroneous. Pl.'s Ltr. dated 12/18/01; Defs.' Resp. at 15. Plaintiff argues that while it is true that it used $25 million as the basis for setting a "strike price" for initial management equity option purposes *in Plaintiff's first quarter of operations*, that this has nothing to do with Plaintiff's ability to readily ascertain the full measure of its damages caused by Defendants' violations. Pl.'s Ltr. dated 12/18/01 (emphasis added.). For instance, Plaintiff asserts that when a newly formed Limited Liability Company (such as ChoiceParts) creates an equity option plan, it is a common and legally permissible business practice to use initial capital contributions (both actual and expected) from the entity's founders as a proxy for the start-up value of the business. *Id.* Plaintiff, thus, contends this is exactly what the referenced document reflects, in that, it depicts Plaintiff's opening position in the fall of 2000. *Id.* Moreover, Plaintiff argues that during the initial start-up of a new entity, there is usually no market history available and commercial activity may not have even begun. *Id.* Furthermore, for purposes of its equity option plan, Plaintiff was not required to estimate the value

28

of its business in future years and it was not required to estimate the value of its goodwill and/or other intangible assets. *Id.*

Plaintiff further asserts that calculating the damages it has suffered as a result of Defendants' conspiracy should involve a different type of analysis. Pl.'s Ltr. dated 12/18/01. *Cf. Heppenstall v. Commissioner,* 8 T.C.M. 136 (1949) (book value is not an appropriate measure of a company's value if it is a going concern). Plaintiff asserts that the analysis used to prove damages, in this case, should entail estimates of Plaintiff's earnings, expenses, and past and future profits.[7] Pl.'s Ltr. dated 12/18/01. Thus, the fact that Plaintiff has determined that it could use capital contributions as a proxy for the initial value of its business for equity option purposes only, has nothing to do with whether Plaintiff can readily prove the full amount of the legally-recoverable damages. *Id.* Plaintiff further argues that when a company uses capital contributions as a proxy for its initial value, that the company cannot be viewed as having definitively established its value forever. Furthermore, Plaintiff argues that if Defendants' assertions were true, a newly formed company that chose to create a stock option plan could never recover damages for lost appreciation in its business. *Id.* Therefore, Plaintiff asserts that it has no adequate remedy at law, in that, it cannot readily prove the full measure of its damages. *Id.*

V.     *Oral Argument.*

At oral argument, the parties presented further evidence regarding the subject motion issues and arguments, which was made part of the record.

---

[7]This type of analysis would involve projections of prices, costs, market condition and various other factors. Pl.'s Ltr. of 12/18/01.

## FINDINGS[8]

As backdrop, it is clearly established in the Seventh Circuit that:

> A preliminary injunction is an extraordinary remedy that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion. (Citations omitted).

*Boucher v. School Bd. Of the School District of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998).

Accordingly, as that court stated in an antitrust case:

> "'(t)he granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'"

(Citations omitted.) *Roland Mach. Co. v. Dresser Indus.*, 749 F.3d 380, 389 (7th Cir. 1984).

Regarding mandatory preliminary injunctions, the Seventh Circuit has firmly declared:

> Because a mandatory injunction requires the court to command the defendant to take a particular action, "mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued." *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978); *see also W.A. Mack, Inc. v. General Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) (finding that "mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds."

*Graham v. Medical Mutual of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

The issues in the case, including the claim(s) of conspiracy, are being strenuously fought by both sides. The underpinning of Plaintiff's case is its allegation of conspiracy. However, the conspiracy issue is very fact-intensive at this preliminary injunction stage. And applying the above heightened standard(s), the court is unable to perceive a clear basis to justify granting a mandatory preliminary

---

[8] Applying the standards set forth in *Ty, Inc. v. The Jones Group, Inc.*, 98 F. Supp. 988, 1002 (N.D. Ill. 2001), the court is unpersuaded that any genuine and material or well-disputed factual issue exists herein and that an evidentiary hearing would be productive. The court therefore finds that an evidentiary hearing is not necessary in resolving the Motion for Preliminary Injunction, and that the Motion is decidable on the papers filed and oral argument presented to the court. It bears noting that after the court indicated that an evidentiary hearing on the motion would not be required, at a minimum, the Plaintiff did not oppose this determination.

injunction on the charge(s) of conspiracy without a full and final hearing on the merits on the mandatory permanent injunction issue.

Although it was not argued by the parties in their briefs in this framework, the court finds that Plaintiff's conspiracy case does not clearly meet the traditional better than negligible likelihood of success on the merits test, when applied to the requisite sliding scale/balance of harm's analysis. As the Seventh Circuit has stated:

> This process involves engaging in what we term the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position. *Id.* The sliding scale approach is not mathematical in nature, rather "it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Id.*

*Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895-896 (7th Cir. 2001).

Upon review, the court finds that although Plaintiff's conspiracy case has a better than negligible chance on the merits, at this juncture Plaintiff, respectfully, does not have a prevailing case on its conspiracy claim(s).[9] Against Plaintiff's evidentiary case of conspiracy, the Defendants presented considerable evidence that the actions of each Defendant were independently and individually prompted for legitimate business reasons and not as part of any conspiracy. Applying, then, the required sliding scale/balance of harms analysis, the court finds that the subject mandatory preliminary injunction issue comes out in the Defendants' favor. Plaintiff has established it will suffer significant harm, but the court finds that the Defendants would suffer perhaps not equal but, nonetheless, meaningful harm if a preliminary injunction was granted herein. A forced license with the Plaintiff would either involuntarily and fundamentally change the way that each of the Defendants do business or remove their ability to

---

[9]Under the conventional reasonable likelihood of success on the merits test, traditionally employed by courts of equity, Plaintiff's conspiracy case would not prevail.

make certain substantive business decisions autonomously. As the clearest example, GM for the first time would lose control of its proprietary data and have that data involuntarily associated in sale promotions with non-OEM knock-off ("aftermarket") and salvage parts.[10] In these circumstances, it cannot be said that the Plaintiff has clearly established a right to a mandatory preliminary injunction.[11]

## CONCLUSION

In view of the foregoing, Plaintiff's motion for preliminary injunction is denied.


**ENTER:**

_IAN H. LEVIN_
**IAN H. LEVIN**
**United States Magistrate Judge**


**Dated: April 18, 2002**

---

[10]Parenthetically: it appears, realistically, as Defendants argue, that if a preliminary injunction is granted, it will, at the least, be difficult to roll back the situation to the present *status quo* if the Defendants prevail at trial.

[11]Although Plaintiff has a stronger case as to the other preliminary injunction elements (e.g. inadequate remedy at law, irreparable harm, public interest), in view of the court's holding, the court deems it unnecessary to decide those elements herein.

In view of our holding herein, it also is deemed unnecessary to decide Plaintiff's threshold argument that no legal basis (or precedent) exists here to compel Defendants to furnish their "proprietary" data to Plaintiff.