UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHOICEPARTS, LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | No. 01 C 0067 |
| v. | ) ) | Hon. Joan B. Gottschall |
| GENERAL MOTORS CORPORATION, a Delaware corporation, DAIMLERCHRYSLER CORPORATION, a Delaware corporation, FORD MOTOR COMPANY, a Delaware corporation, and OE CONNECTION, LLC, a Delaware limited liability company, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Choiceparts, LLC ("CP") has complained that defendants General Motors Corporation ("GM"), DaimlerChrysler Corporation ("DCX") and Ford Motor Company ("Ford")[1] have conspired to prevent CP from offering a new type of automotive parts locator. According to CP, the form the conspiracy took was an agreement among the defendants to withhold automotive parts data that CP needs to develop and operate its internet-based parts locator service. The alleged object of this conspiracy was to prevent access to the "advanced parts locator" market so that OE Connection, LLC ("OEC"), which is a joint venture of the OEMs, could operate without competition. Before the court are: (i) a motion for summary judgment filed jointly by the OEMs and OEC; (ii) a separate motion for summary judgment filed by DCX; (iii) CP's motion to strike all evidence relating to settlement negotiations with DCX; (iv) CP's motion to strike "SUF Charts"

---

[1] In this opinion, GM, DCX and Ford are collectively referred to as the "OEMs."

1

enclosed with defendants' reply briefs; and (v) defendants' motion to strike CP's additional statement of facts.[2]

**Facts**

The OEMs sell cars and original equipment ("OE") parts through their dealers. OE parts are automotive replacement parts that are made by (or under contract for) the OEMs, and are marketed by the OEMs. Also available are new non-OE parts - that is, new parts that are manufactured by other companies than the OEMs or their contractors - and used parts. Frequently, auto dealers buy parts from each other rather than from the OEMS directly, either because the part is unavailable from an OEM or for expediency.

Because the supply of parts is distributed so widely (among the thousands of auto dealers in the United States), various companies have offered electronic "parts locators" to allow dealers to search the inventories of other dealers using the same parts locator program. Automatic Data Processing, Inc. ("ADP") and Reynolds & Reynolds Company ("R&R") offer two of the most prominent parts locator programs, respectively called OneTouch and National Parts Locator.

Parts locator programs generally make use of "Parts Data" as the operative information in their databases. Parts Data consists of pricing information, parts identification numbers, and supersession data, which is information regarding which present part numbers have replaced certain now-obsolete part numbers. Each OEM generates its own distinctive Parts Data, and each OEM's Parts Data is proprietary to that OEM. In addition, most car dealers use computer programs known

---

[2] In issuing this opinion, the court has considered properly supported facts and disregarded facts that are irrelevant, are disguised argument, or are otherwise not properly before the court. Accordingly, both CP's motion to strike "SUF Charts" and defendants' motion to strike CP's additional statement of facts are denied.

as dealer management systems ("DMS") to manage most aspects of their businesses, including to manage the inventory for their parts departments, which DMS systems also use Parts Data. A dealer's DMS typically includes Parts Data for the parts that dealer has in stock. In addition to their parts locator products, ADP and R&R offer DMS systems. The OEMs have licensed their Parts Data to ADP, R&R, and other DMS and parts locator providers for many years.

ADP and R&R, together with CCC Information Services Inc. formed CP as a joint venture in May 2000. Their intent in forming CP was that it would create a product to enable dealers nationwide to use the internet to view a centralized parts database. CP's product promised to allow dealers to link into this database via their DMS systems to order and pay for parts online. As dealers used CP's product, the database would be instantly (or at least very promptly) updated. This system, had it been successfully implemented, would have offered significant efficiencies over the present system of searching multiple (often out-of-date) parts locator databases, and transacting orders via telephone and fax connections. CP has asserted that its product was so far advanced over present "legacy" parts locators that it actually is a different type of product altogether, an "advanced parts locator" ("APL"). CP has claimed that no APL can work effectively without access to complete, up-to-date Parts Data from all of the OEMs because the OEMs "collectively account for over 70% of the cars on the road." (CP Resp. at 9-10). CP was successful in obtaining licenses to Parts Data from many Japanese and German car companies, but could not obtain the OEMs' consent to license their Parts Data.

CP's original intention was to enable marketing of OEM parts, non-OE parts and used parts through its APL products, which were to include an APL to be sold only to dealers to enable electronic transactions in parts between dealers, and an APL to enable similar functionality between

dealers and collision-repair shops that are not associated with dealers. CP has tested early-stage versions of its programs with positive results, and has signed agreements with at least 250 dealers (including dealers in the OEMs' brands), but has not brought its final APL products to market, which CP claims is a direct result of the OEMs' withholding their Parts Data. The OEMs and CP dispute whether CP agreed to the OEMs' requests that any CP APL would limit its functionality between dealers to providing only OE parts, thus preventing dealers from shopping between OE, non-OE and used parts using CP's APL.

OEC is a joint venture of the OEMs and their technology partner Bell & Howell, a non-party. OEC provides an electronic parts locator. The parties dispute when discussions between the OEMs regarding formation of OEC began, but in February 2002 OEC began marketing an electronic parts locator using limited Parts Data from the OEMs. The OEC parts locator product has achieved at least some market success. The parties strenuously contest the OEMs' reasons for forming OEC. CP offers evidence it claims supports its argument that the purpose of OEC was solely to prevent competition in the nascent APL market, and to limit transaction efficiencies that would be occasioned by a true APL product, which would likely result in smaller profit margins in the OEMs' very profitable parts businesses. The OEMs, on the other hand, claim that OEC is a legitimate joint venture created solely to provide more efficient traffic in OE parts. OEC deals only in OE parts, and does not offer non-OE parts or used parts.

**Standard For Summary Judgment**

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

4

Fed.R.Civ.P. 56(c). In the consideration of a motion for summary judgment, the court must view the record and any inferences to be drawn from it in the light most favorable to the party opposing summary judgment. *See Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

**Legal Standard Under the Sherman Act**

Sherman Act § 1 prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Sherman Act § 2 prohibits "monopolizing, or attempting to monopolize, or combining or conspiring with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. Clayton Act § 4 creates a private cause of action for a person injured "in his business or property by reason of anything forbidden in the antitrust laws," providing for treble damages. 15 U.S.C. § 15(a). To recover, the plaintiff must show "injury of the type the antitrust laws were intended to prevent," that is to say, injury flowing from anticompetitive effects of an antitrust law violation. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

CP has alleged that defendants' alleged conspiracy to withhold Parts Data constitutes an unlawful agreement in restraint of trade in violation of Sherman Act § 1, as well as a conspiracy to monopolize the APL market in the United States in violation of Sherman Act § 2. (*See, e.g.*, Compl. ¶ 60.) CP has also alleged an antitrust injury, destruction of CP's (or anyone else's) ability to compete in the APL market, as well as detrimental effects flowing to consumers who will be injured by less efficient car maintenance and repair because car dealers and independent collision and service shops will not have the benefit of competition in the APL market when procuring parts. (*See, e.g.*,

Compl. ¶ 61.)

*Plaintiff's Sherman Act Section 1 Claim*

"A successful claim under Section 1 of the Sherman Act requires proof of three elements: (1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina v. Renfro Prods.*, 8 F.3d 1217, 1220 (7th Cir. 1993). In their motion for summary judgment, defendants do not dispute the first element of proof. Thus, the parties limit their Sherman Act § 1-related arguments to whether CP has made a sufficient showing of unreasonable restraint of trade and antitrust injury to withstand defendants' motions for summary judgment.

Read literally, Sherman Act § 1 prohibits all agreements in restraint of trade, but the Supreme Court has analyzed most commercial restraints under the "rule of reason." The rule of reason "requires the fact finder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition."[3] *Arizona v. Maricopa County Med. Soc'y.*, 457 U.S. 332, 342-43 (1982). Not every § 1 case is analyzed under the rule of reason – the Supreme Court has also recognized *per se* violations of § 1 where, "[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable." *Id*. at 344. *Per se* violations have been held to be associated with, for example, price fixing, geographic division of markets, and tying arrangements. *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir.

---

[3] Under the classic formulation of the rule of reason, the "test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Bd. of Trade v. U.S.*, 246 U.S. 231, 238 (1918). Application of the typical full rule of reason inquiry typically involves an intensive and wide-ranging factual investigation.

1984). The parties vigorously contest the applicable legal rule to apply in analyzing whether the alleged agreement among the OEMs violates Sherman Act § 1, with the OEMs arguing that the rule of reason applies and CP arguing for application of the *per se* rule.

The Supreme Court has set forth guidelines for application of the *per se* rule to cases involving alleged boycotts. Typical features of cases in which *per se* treatment is appropriate are where there have been "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" *Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.*, 472 U.S. 284, 294 (1985) (citing L. SULLIVAN, LAW OF ANTITRUST 229-230 (1977)). *Northwest Wholesale* provides further general guidance:

> In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete. In addition, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote. Although a concerted refusal to deal need not necessarily posses all of these traits to merit *per se* treatment, not every cooperative activity involving a restraint or exclusion will share with the *per se* forbidden boycotts the likelihood of predominantly anticompetitive consequences.

*Id.* (omitting citations). Other factors indicating that a combination is *per se* causing detriment to competition is a situation where "firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor." *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 457-58 (1986).

The Supreme Court has explicitly acknowledged that these categories need not be strictly applied. "The truth is that our categories of analysis of anticompetitive effect are less fixed than terms like 'per se,' 'quick look,' and 'rule of reason' tend to make them appear." *Cal. Dental Ass'n.*

*v. FTC*, 526 U.S. 756, 779 (1999); *Indiana Federation*, 476 U.S. at 460-1 (applying "rule of reason" to find challenged restraint unreasonable under Sherman Act § 1 "even in the absence of elaborate market analysis."). Instead the focus has been on analyzing the actual market effects of the facts before the court to the extent necessary to determine the nature and extent of any anticompetitive effects flowing from the agreements as to which plaintiffs complain. *Cal Dental Ass'n.*, 526 U.S. At 779 ("We have recognized, for example, that 'there is often no bright line separating *per se* from Rule of Reason analysis,' since 'considerable inquiry into market conditions' may be required before the application of any so-called '*per se*' condemnation is justified.") (citing *Nat'l. Collegiate Athletic Ass'n. v. Bd. of Regents*, 468 U.S. 85, 104 n.26 (1984)). The OEMs argue that the court must, in deciding their motion for summary judgment, specify the legal rule to be applied (in their view, the rule of reason), and while CP says that it plans to put on a "full rule of reason" case at trial, it argues extensively that the court should construe this as a *per se* case under *Northwest Wholesale*. Key facts that would determine the applicable legal rule are in dispute.

For example, the parties contest whether or not they are actually competitors, which is one of the *Northwest Wholesale* considerations indicating in favor of application of the *per se* doctrine. This is a complicated question, as it is clear that the OEMs do compete with each other in the sale of cars, but do not compete with each other in the "sale" (licensing) of their respective Parts Data for the simple reason that one OEM's Parts Data is useless to a dealer trying to locate parts for a car made by another OEM. The OEMs claim that they are not competitors with CP in any market. In response, CP has presented evidence that the OEMs would likely be (horizontal) competitors of each

other and CP in the APL market[4] if they had not formed OEC to enter that market in order to preclude competition. *See, e.g.*, CP Resp. at 28; *see also Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir. 1999) (archery manufacturers withholding of archery products from original archery trade show in favor of the manufacturers' competing archery trade show venture states claim for illegal group boycott).

The parties also argue extensively about whether Parts Data is actually "necessary" to enable CP to compete, another of the *Northwest Wholesale* considerations that would indicate in favor of a *per se* violation. The parties each cite plausible expert opinion and other evidence to support their claims. For example, CP points out that OEC's parts locator uses the OEMs' Parts Data, and points both to expert testimony and to statements made by executives at the OEMs that they knew that for an APL locator to work, it would need to incorporate up-to-date Parts Data. The OEMs say that Parts Data are available through each dealer's DMS system, but CP points out that it would still need the OEMs' permission to use the data, no matter where they got it from. The parties characteristically argue this point in great detail, including appropriate citations to the voluminous record, which on balance lead the court to conclude that far too many factual controversies exist to grant defendants summary judgment on this issue.

The "necessity" question indicates one way in which outstanding factual disputes preclude a decision as to the applicable legal rule at this point. If the OEMs convince a fact finder that Parts

---

[4] CP has produced evidence in the form of expert testimony that the APL market exists, and that OEC was intended to enter it. This evidence (and related evidence) is disputed by the OEMs, but construing the facts in favor of CP, the question of the applicability of the APL market survives to be aired before a jury. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 482 (1992) (noting that applicable market definition "can be determined only after a factual inquiry into the 'commercial realities' faced by consumers.")

9

Data were not necessary to successful construction and marketing of an APL product, that would indicate strongly against *per se* treatment of CP's claim, whereas if CP could convince the fact finder that the Parts Data was necessary to its business, it would militate in favor of a finding of *per se* liability as to the OEMs. The parties similarly contest other *Northwest Wholesale* and *Indiana Federation* considerations, including whether the OEMs have market power in the APL or any other applicable market.

The OEMs also argue that their alleged joint refusal to provide Parts Data to CP has had procompetitive effects, including, primarily, the entrant of a new competitor (OEC) into the "locator business." It has yet to be established which market OEC is involved in (APL or the general parts locator market) for purposes of this case. Furthermore, as CP points out, it is not clear that exclusivity for OEC with respect to the OEMs' Parts Data was necessary to achieve the procompetitive effect of OEC's creation and entrance into the marketplace. It is easily conceivable that the OEMs could have reaped many benefits of their joint venture in limiting research and development and other costs in starting OEC, but it is not clear that this cooperative effort necessitated limiting licensing of any Parts Data to third parties, *i.e.*, it is disputed whether permitting OEC exclusive access to Parts Data has had the main effect of helping OEC to enter the (APL or parts locator) market, or if it has primarily inhibited competition in the applicable market. Whether the OEMs' procompetition argument is characterized defensively as a rebuttal of application of the *per se* rule under *Northwest Wholesalers* or offensively as part of a rule of reason "searching inquiry" into actual effects of the alleged refusal to deal, the court cannot rule on the issue because there are material facts essential to such a ruling that are contested, including the effect on competition of the alleged conspiracy to withhold Parts Data.

This discussion is not intended to be a comprehensive description of the many factual disputes at issue, but it gives an indication of the types of issues to be decided by a jury. It is sufficient to note that CP has raised sufficient issues of contested material fact to preclude a determination at this point even of the appropriate legal standard, much less summary judgment on the merits for the OEMs. CP will be allowed to present its full rule of reason case at trial, and the facts found as a result will enable the court to perform the necessary inquiry (whether extensive or "in the twinkling of an eye"[5]) into the anticompetitive effects (if any) caused by the alleged conspiracy, or, conversely to determine if application of the *per se* rule is appropriate.

*CP's Sherman Act § 2 Claim*

With respect to CP's claim under Sherman Act § 2, CP states that it "no longer intends to pursue its Section 2 claims for unilateral conduct," but still wishes to pursue its conspiracy to monopolize claims under Sherman Act § 2. (CP Resp. at 6-7.) Defendants briefly argue that CP's failure to bring forth sufficient facts to maintain its Section 1 claim dooms its Section 2 claim as well, but since CP has shown enough bases of factual dispute to preserve its Section 1 claim, defendants' argument fails. Furthermore, upon review of the record, the court notes that CP has provided facts that, if proven, could enable a reasonable jury to conclude that the OEMs intended to monopolize the APL or other market under Section 2. *Wagner v. Magellan Health Servs.*, 121 F. Supp. 2d 673, 681 (N.D. Ill 2000) ("A conspiracy to monopolize under Section 2 is somewhat different from its Section 1 counterpart because of its heightened intent element, i.e. concerted action

---

[5] *NCAA,* 468 U.S. at 89 n.39 ("The essential point is that the rule of reason can sometimes be applied in the twinkling of an eye.") (quoting P. AREEDA, *The "Rule of Reason," in* ANTITRUST ANALYSIS: GENERAL ISSUES 37-38 (Federal Judicial Center, June 1981) (parenthetical omitted in original)).

by knowing participants who have a specific intent to achieve a monopoly.")

*DCX's Motion for Summary Judgment*

In addition to joining with the other OEMs and OEC in their summary judgment motion, DCX has filed its own motion for summary judgment, claiming that DCX did not actually refuse to provide its parts data to CP, and so cannot be liable under CP's conspiracy-based antitrust theories.[6] DCX points to evidence in the record that it never explicitly told CP that it would withhold its Parts Data; that delays in responding meaningfully to CP's requests to license DCX's Parts Data during 2000 and early 2001 were occasioned by business needs rather than delaying tactics; and that it actually offered a Parts Data license to CP on at least two occasions in May 2001 and December 2001.

CP responds to these arguments in a variety of ways, but for purposes of ruling on DCX's instant motion for summary judgment, it is enough to note that CP has provided sufficient evidence to allow a jury to reasonably decide that DCX's offers of a license were pretextual - including internal documents that could be interpreted to show that DCX did not intend to offer Parts Data to third parties as a result of its agreement with Ford and GM. Furthermore, "[a]nti-trust liability under Section 1 of the Sherman Act is joint and several," and assuming that CP is able to prove that DCX was part of the conspiracy at issue at trial, DCX would be liable. *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1257 (7th Cir. 1980).

---

[6] CP has filed a motion to strike all evidence and arguments relating to settlement negotiations, which CP alleges DCX has referred to in its motion for summary judgment and statement of undisputed facts in violation of Fed. R. Evid. 408. In reviewing DCX's documents, the court has taken into account all properly admissible materials, and disregarded those that are inadmissible. Accordingly, CP's motion to strike all evidence relating to settlement negotiations with DCX is denied without prejudice.

*Antitrust Injury*

To have suffered antitrust injury, a plaintiff must show that its injury "flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). An antitrust violation does not need to be the sole cause of injury, "but the plaintiff must establish, with a fair degree of certainty, that the violation was a material element of, and substantial factor in producing, the injury." *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993).

The OEMs claim that CP cannot establish the "but-for" causal connection required between the alleged conspiracy to withhold Parts Data and the injuries to CP and competition in the APL market. The OEMs' main assertion is that GM decided definitively in February 2000 (prior to beginning its meetings with Ford and DCX regarding their agreement to withhold Parts Data from CP) that it would not license its Parts Data to CP, and that because CP has asserted that it needs Parts Data from all of the OEMs to prosecute its business in the long term, GM's unilateral action caused the full measure of damage. CP responds by pointing out that while the record citations cited by GM mention that GM had concerns about CP's possible business effects on GM, they do not establish that GM had definitively ruled out licensing its Parts Data to CP prior to allegedly reaching agreement as to the matter with Ford and DCX.

The memoranda and other documents GM points to do not conclusively establish that GM had finally decided to refuse to provide its Parts Data to CP prior to the beginning of the alleged conspiracy to withhold it. Accordingly, it is necessary that the circumstantial evidence relied upon by GM be evaluated by a fact finder to establish GM's claim. CP has shown sufficiently to withstand summary judgment that the alleged conspiracy to withhold Parts Data was the main cause

of each of the OEMs' final decisions to withhold such data, and hence, the primary cause of CP's injury and other anticompetitive effects.

***Illinois Consumer Fraud and Deceptive Business Practices Act Claim***

In addition to its federal antitrust claims, CP has brought a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA"), claiming that the OEMs deceived CP by repeatedly reporting that they were considering CP's requests for Parts Data in good faith during the period in which the OEMs were actually conspiring to withhold all Parts Data from CP.

Citing *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 992-93 (Ill. 1990) for the proposition that antitrust claims are not themselves actionable under ICFA, the OEMs make a very brief argument that CP's claim under ICFA must fail because it is wholly derivative of its antitrust claims.[7] That proposition may be true, but it is inapposite. Here CP has provided evidence to support its theory that certain communications from the OEMs were actionable under ICFA in that they intentionally misled CP as to the potential availability of Parts Data. *Kedziora v. Citicorp Nat'l. Servs., Inc.*, 780 F.Supp. 516, 534 (N.D.Ill. 1991) (under ICFA, "[w]hat is required is a showing that the acts and practices were capable of being interpreted in a misleading way"); *Cf. Laughlin*, 550 N.E. at 993 (reaching its holding in part because plaintiffs abandoned "their contention that the transactions were deceptive.")

The court expresses no opinion at this time regarding the likelihood that CP will be able to

---

[7] The OEMs also attempt to make what is essentially a 12(b)(6) argument that CP has failed to plead its ICFA claim with the requisite particularity. A defendant's 12(b)(6) motions must be made before responsive pleading under Fed. R. Civ. Pro. 12(b), and that time is long past. Thus the court considers this aspect of defendants' argument to have been waived.

convince the jury that this deception existed or caused significant damage to CP, but construing the facts in favor of CP, CP's claim of deceptive acts under ICFA, like CP's other claims, survives summary judgment.

For the reasons stated in this opinion, both the OEMs' joint motion for summary judgment and DCX's motion for summary judgment are denied.

Dated: March 30, 2005                               ENTER:


                                                    __/s/_____
                                                    Joan B. Gottschall
                                                    United States District Judge